UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES MURRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:12CV2214 TIA |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves Applications for Disability Insurance Benefits under Title II of the Social

Security Act and for Supplemental Security Income under Title XVI of the Act. Claimant has

filed a Brief in Support of his Complaint; the Commissioner has filed a Brief in Support of her

Answer. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. §

636(c).

**I.      Procedural History**

On July 26, 2010, Claimant Charles R. Murray filed Applications for Disability

Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 100-06) and for

Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42

U.S.C. §§ 1381, et. seq.  (Tr. 107-11).[1]  Claimant states that his disability began on October 15,

2008, as a result of history of left shoulder separation, enlarged heart, and high blood pressure.

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer
(Docket No. 12/filed March 4, 2013).

(Tr. 44).  On initial consideration, the Social Security Administration denied Claimant's claims for benefits.  (Tr. 44-47).  Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 48).  On October 26, 2011, a hearing was held before an ALJ.  (Tr. 24-40).  Claimant testified and was represented by counsel.  (Id.).  Vocational Expert John F. McGowan, Ed.D, also testified at the hearing.  (Tr. at 36-39, 63-64).  Thereafter, on December 22, 2011, the ALJ issued a decision denying Claimant's claims for benefits.  (Tr. 7-20).  After considering the attorney supplied medical evidence from the Family Care Health Center and the University Medical Center of El Paso, the Appeals Council on October 26, 2012 found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision.  (Tr. 1-5,96-97, 295-329, 330-39).  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on October 26, 2011

#### 1.  Claimant's Testimony

At the hearing on October 26, 2011, Claimant testified in response to questions posed by the ALJ and counsel.  (Tr. 24-36).  At the time of the hearing, Claimant was fifty-three years old.  (Tr. 26).  Claimant completed part of the eleventh grade and never received a GED.  (Tr. 26-27).  Claimant stands at five feet five inches and weighs approximately 245 pounds.  (Tr. 27).  He is right-handed.  (Tr. 36).  Claimant testified that he smokes a package of cigarettes a day.  (Tr. 29).

Claimant testified that he last worked as an over-the-road trucker.  (Tr. 27).  Some of the jobs required loading and unloading around fifty pounds.  (Tr. 27).  Claimant stopped working as

a truck driver in 2008 when he reported being sick, and he could not make the loads on time so he was released. (Tr. 28). Claimant applied for and received unemployment benefits for twenty-nine weeks while looking for jobs. (Tr. 28).

Claimant testified that he injured his left shoulder in 2004 and reinjured the shoulder in 2010 while holding a hot water heater so a friend could bust a pipe. (Tr. 29-30). He experiences soreness and pain. (Tr. 30). Lifting things, pushing shopping carts, and reaching down to pick up things increases the pain. (Tr. 31-32). Claimant testified that propping a pillow under his arm and lying down alleviates the pain, and he takes these measures every few hours. (Tr. 32). He used to take Darvocet and tried Vicodin and Hydrocodone but the medications caused him to be sick to his stomach. (Tr. 33). Claimant has high blood pressure, and the medications prescribed have leveled out his high blood pressure. (Tr. 28-29). He started taking medication for high cholesterol two months earlier. (Tr. 29).

Claimant receives psychological treatment from a nurse practitioner, psychiatrist, and a therapist at the Family Care Center for his mental problems. (Tr. 30). Dr. Iqbal, the psychiatrist, sees him once a month and is trying to help him cope and be around people. (Tr. 31). Dr. Iqbal diagnosed him with post traumatic stress disorder caused by the accident in 2004. (Tr. 33). He has nightmares and flashbacks from the accident. (Tr. 34). Claimant started receiving treatment after his nurse practitioner referred him due to his anxiety. (Tr. 31). Claimant testified that the anxiety makes him feel like he does not want to do anything. (Tr. 31). Claimant testified that he experiences panic attacks whenever he goes to the store or is around people. (Tr. 34). He has crying spells every day. (Tr. 35).

## 2. Testimony of Vocational Expert

Vocational Expert John McGowan testified in response to the ALJ's questions. (Tr. 36-39). The ALJ asked Dr. McGowan to assume that

> a hypothetical claimant, age 50 to alleged date of onset. It's been opined this hypothetical claimant can lift and carry 20 pounds occasionally, 10 pounds frequently; stand or walk for six hours out of eight; sit for six; can occasionally climb stairs or ramps, never ropes, ladders or scaffolds; reaching overhead is limited to none on the left non-dominant arm. And this hypothetical claimant should avoid concentrated exposure to extreme cold, hazards of unprotected heights, and vibration.
>
> In addition this hypothetical claimant is able to understand, remember and carry out at least simple instructions and non-detailed tasks, can respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent; should not work in a setting which includes constant or regular contact with the general public and should not perform work which includes more than infrequent handling of customer complaints.
>
> Given those restrictions and those alone could this hypothetical claimant return to any past relevant work?

(Tr. 36-37). Dr. McGowan opined that such an individual could not perform past relevant work inasmuch as everything Claimant performed as a truck driver fell into the medium exertional level, and the hypothetical included light exertional level. (Tr. 37).

In response to the query regarding other work, Dr. McGowan confirmed that Claimant could not reach overhead on the left, and he has no restrictions necessary on handling, fingering, or feeling. (Tr. 37). Dr. McGowan testified that Claimant could perform routine type assembly work including a small parts assembler, a light exertional job with 3,900 jobs in the region and 345,000 nationally; and hospital products assembling, sealing plastic disposable products, with 450 jobs in the region and 26,400 nationally. (Tr. 38).

Next, counsel asked Dr. McGowan to assume that the hypothetical individual "in

addition to the limitations in the hypothetical question would have one to two excused absences per day" requiring him to leave the work station. (Tr. 38). Dr. McGowan opined that such individual could not perform competitive employment especially at the unskilled level. (Tr. 38-39).

### 3. Forms Completed by Claimant

In the Function Report - Adult, Claimant indicated he starts his day by taking blood pressure medication and pain pill and then eating a bowl of cereal. (Tr. 143). He then lies down and props his shoulder with a pillow, and he repeats this procedure all day. (Tr. 143).

## III. Medical Records

Claimant went to Family Care Health Center on November 19, 2008 to establish care. (Tr. 204). He reported moving back to St. Louis from Arkansas and experiencing burning and itching of his right lower leg, hypertension, and locking up of his left shoulder. He has smoked a pack and half of cigarettes for thirty-three years. Robin Musselman, R.N.C.S., diagnosed Claimant with morbid obesity, hypertension, and tobacco abuse and prescribed Lisinopril. (Tr. 204).

On November 24, 2008, Claimant returned for treatment of his hypertension. (Tr. 203). Ms. Musselman noted Claimant has probable polycythemia vera and directed him to see Hematology at Connect Care. (Tr. 203). Ms. Musselman discussed smoking cessation and gave him two boxes of Nicoderm patches and encouraged him to lose weight. (Tr. 203).

In follow-up treatment for hypertension on December 29, 2008, Claimant reported doing well. (Tr. 198). Ms. Musselman discussed smoking cessation again at length. Claimant indicated that he would quit as soon as he received disability and could afford patches. Examination showed no decreased sensation in his left arm. (Tr. 198).

On February 26, 2009, Dr. Joshua Field at Washington University, Division of Hematology, evaluated his polycythemia on referral.  (Tr. 212).  Dr. Field opined that "the most likely cause of the patient's polycythemia is his potential obstructive sleep apnea and smoking may be contributing as well." Dr. Fields recommended decreasing his amount of cigarette use and undergo a formal sleep study.  (Tr. 212).

On March 10, 2009, Claimant returned for a follow-up visit at Family Care Health Center for his hypertension.  (Tr. 195).  He reported being seen at Connect Care Hematology for possible polycemia.  Claimant reported walking for exercise and having no shortness of breath.  He has lost fifteen pounds and reported feeling better.  Ms. Musselman discussed smoking cessation.  (Tr. 195).

In the February 4, 2010 Family Care Health Center Progress Note, Claimant reported living with his sister and having difficulty getting money for his medications.  (Tr. 192).  He reported left shoulder pain and decreased range of motion.  Ms. Musselman noted how he made a referral for Claimant to be treated by an orthopedic but he failed to go.  Connect Care related his issue of polycythemia to his smoking and the need for a CPAP machine. Claimant reported smoking one package of cigarettes each day.  He was prescribed Vicodin.  (Tr. 192).

The April 12, 2010 of his left shoulder showed left acromioclavicular joint dislocation.  (Tr. 180, 211).  In the Family Care Health Center Progress Note, Claimant reported left shoulder pain and not being able to tolerate Vicodin and Tylenol #3 and having an ortho appointment in June.  (Tr. 188).

On July 12, 2010, Claimant received treatment as a new patient for shoulder pain he experienced after helping his sister move a hot water heater in her home.  (Tr. 178).

Examination showed some weakness and pain by motion in his left shoulder. Dr. David Kieffer diagnosed Claimant with separation of shoulder and prescribed Darvocet as treatment. (Tr. 178).

On August 11, 2010, Dr. Scott Kaar evaluated his left AC separation. (Tr. 218). Claimant reported injuring his left shoulder in 2005 and then sustaining a new injury approximately ten months earlier and further AC separation and not having any treatment since that time. Dr. Kaar observed Claimant to walk with a normal gait. (Tr. 218). Examination showed right shoulder to have full active and passive range of motion, and left shoulder to have 90 degrees of active elevation and anterior pain. (Tr. 218-19). Dr. Kaar opined Claimant has easily identifiable AC separation with chronic symptoms and recommended physical therapy, daily use of anti-inflammatories and ice, and smoking cessation. (Tr. 219). Dr. Kaar directed Claimant to return in two months to discuss treatment. (Tr. 219).

In the Physical Residual Functional Capacity Assessment ("PRFCA") dated September 25, 2010, Patricia Chaplin listed left shoulder separation as his primary diagnoses and obesity as his secondary diagnosis. (Tr. 225). The PRFCA form states that Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 226). In support, the disability examiner cited to the medical record. (Tr. 226-27). With respect to postural limitations, the examiner found he could occasionally climb and balance. (Tr. 227). He is limited in manipulation to reaching all directions including overhead. (Tr. 227). With respect to visual, communicative, and environmental limitations, the examiner found none existed. (Tr. 227-28).

In follow-up treatment on October 27, 2010, Dr. Kaar noted Claimant to be doing

physical therapy, icing, taking anti-inflammatories but he still has activity-related pain in his shoulders. (Tr. 231). Examination showed right shoulder has full active and passive range of motion, and the left shoulder has full passive range of motion and limited active motion secondary to pain and intact strength. Dr. Kaar also noted tenderness and obvious deformity at the AC joint. Dr. Kaar opined that the left shoulder acromioclavicular separation to be unresponsive to conservative treatment and discussed treatment options including CC ligament reconstruction with an autograft with semitendinosus but he would have to stop smoking. Claimant to return in five weeks to see whether he stopped smoking and to discuss further surgical options. (Tr. 231).

In follow-up treatment for his hypertension and AC joint separation on November 30, 2010, Claimant reported wanting to have surgery to seek if the surgery could correct his shoulder problem. (Tr. 249). He has so much pain he cannot lift his shoulder. Ms. Musselman found his hypertension controlled by medications, and suggested he discuss pain medications for his shoulder with Dr. Kaar. (Tr. 249).

On December 1, 2010, Claimant returned to St. Louis University Hospital for follow-up of his left shoulder AC separation. (Tr. 255). Dr. Kaar noted how he had discussed treatment options with Claimant one month earlier including how he had to stop smoking but he continues to smoke. Dr. Kaar explained how "smoking places any potential surgery as a much higher risk of failure." Dr. Kaar observed Claimant to walk with a normal gait. Examination showed his left shoulder to have full passive range of motion and limited active range of motion secondary to pain and intact strength. Dr. Kaar noted Claimant has tenderness and obvious deformity in the AC joint - separation. Dr. Kaar opined that "[l]eft shoulder grade 5 acromioclavicular

- 8 -

separation, unresponsive to conservative management, however, he continues to smoke." (Tr. 255). Dr. Kaar explained again how Claimant has to stop smoking if he wants to consider s surgical coraclavicular ligament reconstruction to reduce his AC joint. After discussing narcotic pain medications, Dr. Kaar determined the new anti inflammatory medication prescribed by his primary care physician should suffice. (Tr. 255).

On December 21, 2010, Claimant returned for treatment for his dyslipidemia and depression. (Tr. 248). Ms. Musselman increased his Prozac dosage. (Tr. 248). In a follow-up visit, Claimant reported not liking to be around people, and this has been going on for eighteen years. (Tr. 246). He indicated that he did not feel the need to see a psychiatrist or receive counseling. Ms. Musselman noted how he spent most the visit discussing tobacco cessation. (Tr. 246). On February 22, 2011, Ms. Musselman noted that Claimant had not gotten the Nicotrol inhaler to assist in his smoking cessation. (Tr. 245). He reported not being sure he wanted to quit smoking or to have the surgery. He had not turned in the paperwork to get the Nicotrol inhaler. Claimant agreed to see a psychiatrist. (Tr. 245).

On April 18, 2011, Dr. Sherifa Iqbal evaluated Claimant's depression on referral. (Tr. 274). Claimant reported having issues being in public. (Tr. 274). ETOH at St. Anthony's is listed as his previous inpatient. (Tr. 275). Dr. Iqbal listed finances and employment as his limitations and prescribed Paxil. (Tr. 277-78).

On May 25, 2011, Claimant reported being anxious and experiencing a panic attack in the grocery store. (Tr. 269). Dr. Iqbal noted Claimant has no loss of interest in activities. Dr. Iqbal observed his behavior demonstrated no psychomotor abnormalities, his affect to be normal, and insight to be intact. (Tr. 269). Dr. Iqbal prescribed Paxil. (Tr. 270). On referral by Dr.

Iqbal, Claimant started counseling because of his significant anxiety problems around other people. (Tr. 271). Claimant reported having severe anxiety for fifteen years, and he has a separated shoulder he does not think he will have repaired. Dale Seiben, LCSW, noted Claimant is seeing a psychiatrist and this is the first time he has seen a mental health provider. (Tr. 271).

On June 13, 2011, Claimant received psychotherapy for moderate recurrent major depression and chronic post-traumatic stress disorder. (Tr. 267). Claimant reported having a panic attack in the grocery store. Mr. Seiben noted how he has appointment with Dr. Iqbal the following week and would discuss possible medication changes because his anxiety is intolerable. (Tr. 267).

Claimant reported being more irritable in a follow-up visit with Dr. Iqbal on June 20, 2011. (Tr. 265). Dr. Iqbal observed no decrease in concentrating ability, and his judgment was not impaired and insight was intact. (Tr. 265).

On July 11, 2011, Claimant returned for follow-up treatment with Ms. Musselman. (Tr. 261). On July 18, 2011, Dr. Iqbal observed Claimant to be interacting with other patients in the waiting area without issue. (Tr. 259). He reported going to the casino with his sister and becoming panicky. (Tr. 259). Dr. Iqbal prescribed Paxil as treatment. (Tr. 260).

In a follow-up visit on August 15, 2011, Claimant returned for treatment for hyperlipidemia. (Tr. 256). Ms. Musselman noted how he had started on Crestor a month earlier. Claimant reported the increased dosage of Prozac made him more irritable, and he continues to smoke and has no desire to quit. (Tr. 256). Ms. Musselman noted in the assessment Claimant has benign essential hypertension and hyperlipdemia. (Tr. 258).

On August 29, 2011, Claimant reported issues with housing. (Tr. 292). Dr. Iqbal noted

that Claimant had been talking with another patient in the waiting area. (Tr. 292). Dr. Iqbal continued his medication regimen. (Tr. 293).

On September 12, 2011, Claimant reported still having housing issues and concerned about his disability. (Tr. 288). Dr. Iqbal continued his medication regimen. (Tr. 289). Claimant reported to Mr. Seiben he has been going to the grocery store each week, and his housing situation is very stressful and causes him anger. (Tr. 290).

Claimant reported he has been working on challenging his fears by doing more things outside the house. (Tr. 286). He had a rough couple of weeks when his food stamps were temporarily cut off. (Tr. 286).

On October 10, 2011, Mr. Seiben noted how Claimant went to the grocery store, and he is consistent with appointments. (Tr. 284-85). Claimant reported being alright and having problems with sleep and anger. (Tr. 282). Dr. Iqbal prescribed Risperdal, Hydroxyzine, and Paxil. (Tr. 283). In a follow-up visit on October 31, Claimant reported being uncomfortable being in social security hearing room. (Tr. 321).

Claimant returned for treatment of his hypertension on November 7, 2011. (Tr. 317). Ms. Musselman counseled him to stop smoking and lose weight. (Tr. 319).

In follow-up treatment on November 18, 2011, Claimant reported having an argument with his landlord and planning to go to the grocery store the following week. (Tr. 313). Mr. Seiben noted how Claimant walked away from an argument. (Tr. 314).

Claimant had an elevated creatinine on last CMP. (Tr. 311). On November 21, 2011, Ms. Musselman noted that Claimant's last visit was on February 22, 2011 and treated his hyperlipidemia. (Tr. 311).

On November 28, 2011, Claimant reported visiting with disabled guests at his neighbor's apartment. (Tr. 309). Dr. Iqbal continued his medication regimen. (Tr. 310).

On December 5, 2011, Claimant reported his only goal is to be able to get a place of his own after he gets disability. (Tr. 305). Mr. Seiben discussed contingency plans for housing if he is not awarded disability and housing resources. (Tr. 308).

On January 30, 2012, Claimant failed to appear for his scheduled appointment with Dr. Iqbal. (Tr. 304). The letter notes how this is the second no show for an appointment. (Tr. 304).

In a follow-up visit on June 5, 2012, Dr. Iqbal noted how he has not seen Claimant in over six months. (Tr. 302). Claimant reported being in jail for two months on child support charges and waiting for disability. He has Missouri Healthnet. Dr. Iqbal observed his mood to be maintained. (Tr. 302). Dr. Iqbal continues his medication regimen. (Tr. 303).

On June 6, 2012, Claimant reported being compliant with therapy and having been in jail for two months and released in March. (Tr. 296). He smokes two packages of cigarettes a day. (Tr. 296). Ms. Musselman listed hypertension, shoulder dislocation, and carpal tunnel syndrome in her assessment. (Tr. 298).

## IV. The ALJ's Decision

The ALJ found that Claimant meets the insured status requirements of the Social Security Act through December 31, 2013. (Tr. 12). Claimant has not engaged in substantial gainful activity since October 15, 2008, the alleged onset date. The ALJ found that the medical evidence establishes that Claimant had the following severe impairments: obesity, history of left shoulder separation, depression, anxiety, and post-traumatic stress disorder (PTSD), but does not have an impairment or combination of impairments that meets or medically equals one of the

- 12 -

listed impairments. (Tr. 13-14). The ALJ opined that Claimant has the residual functional capacity to perform light work. (Tr. 15). The ALJ found that Claimant can lift and carry twenty pounds occasionally, ten pounds frequently, sit at least six hours out of eight, and stand/walk at least six hours out of eight. The ALJ found he cannot climb ropes, ladders, and scaffolds; only occasionally climb stairs and ramps; and cannot reach overhead with left non-dominant arm. Claimant must avoid concentrated exposure to extreme cold, unprotected heights and vibration. The ALJ found Claimant is able to understand, remember, and carry out at least simple instructions and non-detailed tasks; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent. Claimant should not work in a setting which includes constant/regular contact with the general public and should not perform work which includes more than infrequent handling of customer complaints. (Tr. 15). The ALJ found that Claimant is unable to perform any past relevant work as a truck driver. (Tr. 18).

The ALJ found Claimant was born on November 22, 1957, and was almost fifty-one years old which is defined as an individual closely approaching advanced age, on the alleged disability onset date. (Tr. 18). The ALJ noted Claimant has a limited education and is able to communicate in English. The ALJ noted that the transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules supports a finding that Claimant is not disabled whether or not Claimant has transferable job skills. (Tr. 18). Considering Claimant's age, education, work experience, and residual functional capacity, the ALJ opined there are jobs that exist in significant numbers in the national economy that Claimant can perform including small parts assembler. (Tr. 18-19). The ALJ concluded that

- 13 -

Claimant was not under a disability from October 15, 2008, through the date of this decision. (Tr. 19).

**V.    Discussion**

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he

must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire

administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The claimant's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The claimant's subjective complaints relating to
    exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the claimant's impairments.

6.  The testimony of vocational experts when required which
    is based upon a proper hypothetical question which sets forth the claimant's
    impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935

(8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a

reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730

(quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the

record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly

detracts from that decision. Id. The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d

1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at

730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record because the ALJ failed to point to some medical evidence.  Claimant also contends that the hypothetical question to the vocational expert did not capture the concrete consequences of his impairment..

A.    Residual Functional Capacity

Claimant contends that the ALJ erred in formulating the RFC inasmuch as the RFC is not supported by medical evidence.

A claimant's RFC is what he can do despite his limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  The claimant has the burden to establish his RFC.  Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a).  The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace.  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (internal quotation marks and citation omitted).  An ALJ's RFC assessment which is not

properly informed and supported by some medical evidence in the record cannot stand. Id.

The ALJ opined that Claimant has the residual functional capacity to perform light work. The ALJ found that Claimant can lift and carry twenty pounds occasionally, ten pounds frequently, sit at least six hours out of eight, and stand/walk at least six hours out of eight. The ALJ found he cannot climb ropes, ladders, and scaffolds; only occasionally climb stairs and ramps; and cannot reach overhead with left non-dominant arm. Claimant must avoid concentrated exposure to extreme cold, unprotected heights and vibration. The ALJ found Claimant is able to understand, remember, and carry out at least simple instructions and non-detailed tasks; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent. Claimant should not work in a setting which includes constant/regular contact with the general public and should not perform work which includes more than infrequent handling of customer complaints.

At the outset, the undersigned notes that the fact that Claimant did not allege any mental impairments in his applications for disability benefits is significant, even though he submitted some medical evidence of treatment for depression and post-traumatic stress disorder starting more than two years after his alleged onset date. In his applications for disability benefits, Claimant alleged disability due to history of left shoulder separation, enlarged heart, and high blood pressure. The ALJ found Claimant has the severe impairments of obesity,[2] history of left shoulder separation, depression, anxiety, and post-traumatic stress disorder and concluded that

---

[2]It is important to note that all of Claimant's examining doctors were aware of his obesity, but none of the doctors who examined Claimant provided an opinion or imposed limitations greater than that identified by the ALJ. See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004) ("Although his treating doctors noted that Forte was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions.").

the impairments, alone or in combination, are not of listing level. A review of Claimant's applications shows that Claimant failed to allege mental impairments as a basis for disability. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (failure to allege disabling mental impairment in application is significant, even if evidence of depression was later developed). Claimant did not testify at the hearing that his mental impairments affect his ability to function, and the ALJ fulfilled his duty of investigating this claim not presented in the applications for benefits but for the first time raised by Claimant in his brief. The undersigned concludes that the ALJ did not err in discounting Claimant's mental impairments. See Kirby v. Astrue, 500 F.3d 705, 707-09 (8th Cir. 2007) (impairment is not severe if it is only slight abnormality that would not significantly limit mental ability to do basic work activities; claimant bears the burden of establishing impairment's severity). The ALJ opined that Claimant at the hearing "did not endorse a significant number of symptoms from psychiatric problems until responding to a laundry list inquiry by his attorney." (Tr. 16). The ALJ opined that his mental impairments did not significantly limit his ability to perform basic work activities beyond that considered in the RFC.

The undersigned finds the record is devoid of any evidence supporting Claimant's contention that his mental impairments are severe. First, Claimant never alleged that his mental impairments were disabling, and he presented no medical evidence substantiating this claim. Claimant never alleged any limitation in function as a result of his mental impairments in his application for benefits. Indeed, the medical evidence is devoid of any support. Dr. Iqbal noted Claimant has no loss of interest in activities and observed his behavior demonstrated no psychomotor abnormalities, his affect to be normal, no decreased concentrating ability, and

insight to be intact. Dr. Iqbal's mental examinations found Claimant to be within normal limits. Although Claimant reported having issues being in public, Dr. Iqbal observed Claimant interacting with other patients in the waiting without problem. The record showed Claimant failed to appear for two scheduled appointment with Dr. Iqbal, and how there was a six-month gap period when Claimant did not seek treatment from Dr. Iqbal. The ALJ is under "no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (quoting Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996)). Accordingly, this claim is without merit.

In his decision the ALJ thoroughly discussed the medical evidence of record, noncompliance medical treatment, lack of mental restrictions, receipt of unemployment benefits, activities of daily living, and inconsistencies in the record. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician in any treatment notes stated that Claimant was disabled or unable to work or imposed mental limitations on Claimant's capacity for work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining

physician's failure to find disability a factor in discrediting subjective complaints). The absence of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012); Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). Further, the ALJ noted that Claimant first was seen for psychiatric evaluation in April 2011.

Likewise, the ALJ noted how the medical record is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment. Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling condition). The medical record shows that Dr. Kaar first recommended physical therapy and ice and prescribed medications as treatment and when the conservative treatment did not work, Dr. Kaar recommended a surgical procedure but he would have to quit smoking. In follow-up treatment, Dr. Kaar explained how "smoking places any potential surgery as a much higher risk of failure." The undersigned further notes how Claimant had been advised to cease smoking by a number of other health care providers, but at the time of the hearing, he admitted to still smoking one package of cigarettes each day. See Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) ("[A]n ALJ may properly consider the claimant's noncompliance with a treating physician's directions, including failing to

take prescription medications, seek treatment, and quit smoking."); Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 1996) (citing Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding impairments which are controllable or amenable to treatment do not support a finding of disability, and failure to follow a prescribed course of remedial treatment, including cessation of smoking, without good reason is grounds for denying an application of benefits). Such noncompliance with treatment is a proper factor in the credibility analysis.

The ALJ also properly considered the inconsistencies between Claimant's allegations and his daily activities and found his mild restriction to be largely self-imposed. The ALJ noted that Claimant "is able to do as pleases when he pleases." (Tr. 14). The ALJ found Claimant can takes his medication and feeds himself throughout the day without assistance, and he has no significant issues with personal care except having to use his dominant right hand. Claimant helps his sister with laundry and folding clothes and goes to the food pantry with her and shops for groceries twice a month. The ALJ found that Claimant socializes with his sister while watching television or playing cards. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001) ("[i]nconsistencies between subjective complaints of pain and daily living patterns diminish credibility"); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (finding that activities such as driving, shopping, watching television, and playing cards were inconsistent with the claimant's complaints of disabling pain). Likewise, the undersigned notes that in a couple of treatment notes a doctor observed him socializing with patients in the waiting room.

Another inconsistency in the record would be Claimant's alleged daily crying spells as he testified at the hearing. A review of the record shows he never reported daily crying spells during treatment with Dr. Iqbal. Contradictions between a claimant's sworn testimony and what

he actually told physicians weighs against the claimant's credibility. <u>Karlix v. Barnhart</u>, 457 F.3d 742, 748 (8th Cir. 2006) (finding a lack of credibility when claimant's testimony regarding drinking consumption conflicted with medical documentation). As such, the undersigned finds that the ALJ's consideration of the discrepancies between Claimant's testimony and what he told doctors is supported by substantial evidence.

At the hearing, Claimant testified that he applied and received unemployment benefits for twenty-nine weeks. A claimant who applies for unemployment compensation benefits holds himself out as available, willing, and able to work. <u>See</u> Mo Rev. Stat. § 288-040(1)-(2). Because such application necessarily indicates an ability to work, it is evidence that weighs against an applicant's claim that he was disabled. <u>See</u> <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1074 (8th Cir. 1991). A claimant who applies for unemployment compensation benefits holds himself out as available, willing, and able to work. Because such application necessarily indicates an ability to work, it is evidence which negates Claimant's claim that he was disabled. <u>See</u> <u>Black v. Apfel</u>, 143 F.3d 383, 387 (8th Cir. 1998) (applying for unemployment compensation is evidence negating a claimant's claim of disability); <u>see</u> <u>also</u> <u>Salts v. Sullivan</u>, 958 F.2d 840, 846 n. 8 (8th Cir. 1992) ("[I]t is facially inconsistent for [a claimant] to accept unemployment compensation while applying for social security benefits."). Receipt of unemployment benefits after the Claimant stopped working is a fact inconsistent with an inability to work.

In support of his credibility findings, the ALJ noted that Claimant's noncompliance with treatment greatly detracted from his credibility. The ALJ also noted the primary aggravating factor on the record is Claimant's failure to stop smoking precluded a surgical treatment option for his shoulder. A lack of desire to improve one's ailments by failing to follow suggested

medical advice detracts from a claimant's credibility.  See <u>Dunahoo v. Apfel</u>, 241 F.3d 1033,

1037 (8th Cir. 2001) (claimant's failure to follow prescribed course of treatment weighed against

credibility when assessing subjective complaints of pain); <u>Johnson v. Bowen</u>, 866 F.2d 274, 275

(8th Cir. 1989) (holding that an ALJ can discredit subjective complaints of pain based on

claimant's failure to follow a prescribed course of treatment); <u>Kisling v. Chater</u>, 105 F.3d 1255,

1257 (8th Cir. 1997) (holding impairments which are controllable or amenable to treatment do

not support a finding of disability, and failure to follow a prescribed course of remedial

treatment, including cessation of smoking, without good reason is grounds for denying an

application of benefits).  Additionally, subjective complaints of pain may be discredited where a

claimant ceases to stop smoking  upon a doctor's advice.  See <u>Choate v. Barnhart</u>, 457 F.3d 865,

872 (8th Cir. 2006) ("[A]n ALJ may properly consider the claimant's noncompliance with a

treating physician's directions, including failing to take prescription medications, seek treatment,

and quit smoking."); <u>Wheeler v. Apfel</u>, 224 F.3d 891, 895 (8th Cir. 1996) (citing <u>Kisling v.</u>

<u>Chater</u>, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding impairments which are controllable or

amenable to treatment do not support a finding of disability, and failure to follow a prescribed

course of remedial treatment, including cessation of smoking, without good reason is grounds for

denying an application of benefits).  Indeed, Claimant reported that he had no desire to stop

smoking.

Additionally, subjective complaints of pain may be discredited where a claimant ceases

to stop smoking  upon a doctor's advice.  See <u>Choate v. Barnhart</u>, 457 F.3d 865, 872 (8th Cir.

2006) ("[A]n ALJ may properly consider the claimant's noncompliance with a treating

physician's directions, including failing to take prescription medications, seek treatment, and quit

smoking."); <u>Wheeler v. Apfel</u>, 224 F.3d 891, 895 (8th Cir. 1996) (citing <u>Kisling v. Chater</u>, 105

F.3d 1255, 1257 (8th Cir. 1997) (holding impairments which are controllable or amenable to

treatment do not support a finding of disability, and failure to follow a prescribed course of

remedial treatment, including cessation of smoking, without good reason is grounds for denying

an application of benefits).  Therefore, Claimant's failure to cease smoking detracts from his

claim that he is unable to engage in substantial gainful employment.

     After engaging in a proper credibility analysis, the ALJ incorporated into Claimant's RFC

those impairments and restrictions found to be credible.  <u>See</u> <u>McGeorge v. Barnhart</u>, 321 F.3d

766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the

impairments and limitations he found credible based on his evaluation of the entire record.").

The ALJ determined that the medical evidence supported a finding that Claimant could perform

light work except in relevant part no reaching overhead with left non-dominant arm and in a

setting where contact with others is casual and infrequent and not in a setting involving

constant/regular contact with the general public or work which includes more than infrequent

handling of customer complaints.  The vocational expert testified in response to a hypothetical

question, that incorporated the same limitations as the RFC, and opined that such individual

could perform work as a small parts assembler and hospital products assembler.

     As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied

relief solely on the lack of objective medical evidence to support his finding that Claimant is not

disabled.  Instead, the ALJ considered all the evidence relating to Claimant's subjective

complaints, including the various factors as required by <u>Polaski</u>, and determined Claimant's

allegations not to be credible.  Although the ALJ did not explicitly discuss each <u>Polaski</u> factor in

making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints.  See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).  Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court.  Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings.  See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (deference given to ALJ's credibility determination when it is supported by good reasons and substantial evidence); Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

      The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility.  The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility.  See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence).  Those included Claimant's  medical evidence of record, noncompliance with medical treatment, lack of mental restrictions, receipt of unemployment benefits, and inconsistencies in the record. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v.

Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints of pain. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)(affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).

The substantial evidence on the record as a whole supports the ALJ's decision. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.      Hypothetical Question Posed to Vocational Expert

Claimant contends that the testimony of the vocational expert did not constitute substantial evidence upon which a determination could be made that Claimant was not disabled arguing only that the expert's opinion is flawed by not capturing the concrete consequences of his impairment.

The ALJ may seek the opinion of a vocational expert regarding jobs the claimant can

perform.  Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001).  The vocational expert will

be asked to respond to a hypothetical question, posed by the ALJ, which includes all of the

impairments of the claimant.  The question must "precisely set out the claimant's particular

physical and mental impairments."  Leoux v. Schweiker, 732 F.2d 1385, 1388 (8th Cir. 1984).

The ALJ's hypothetical question posed to a vocational expert need not include alleged

impairments which the ALJ has rejected as untrue.  Young v. Apfel, 221 F.3d 1065, 1069 (8th

Cir. 2000); Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997).  As discussed above, the ALJ

found that the medical record is devoid of any doctor finding or imposing any significant mental

or physical limitations upon Claimant's functional capacity during the relevant time period.

Claimant's contention that the ALJ erred in finding him able to occasionally lift with his left

non-dominant upper extremity is without merit inasmuch as the ALJ accepted Claimant's

testimony and found he could never reach overhead with his left arm.  Although Claimant argues

that he has more limitations than found by the ALJ, he does not present any evidence

demonstrating that he suffered restrictions more limiting than as determined by the ALJ and

posed to the vocational expert in the hypothetical.  Cf. Robson v. Astrue, 526 F.3d 389, 393 (8th

Cir. 2008) (claimant did not identify what limitations were missing from hypothetical).

In addition, the undersigned notes that the ALJ based his hypothetical question on

medical evidence contained in the record as a whole.  Accordingly, Claimant's claim that the

hypothetical opinion given by the vocational expert was flawed inasmuch as it relied on the RFC

should be denied.  This claim is without merit inasmuch as the hypothetical included those

impairments the ALJ found credible.  A proper hypothetical must include only those

impairments accepted as true by the ALJ.  Pearsall, 274 F.3d at 1220.  Furthermore, an ALJ may

omit alleged impairments from a hypothetical question posed to a vocational expert when "[t]here is no medical evidence that these conditions impose any restrictions on [the claimant's] functional capabilities." Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994). Likewise, an ALJ may omit alleged impairments from a hypothetical question when the record does not support the claimant's contention that his impairments "significantly restricted his ability to perform gainful employment." Eurom v. Chater, 56 F.3d 68 (8th Cir. 1995) (per curiam) (unpublished table decision). The ALJ did not include the alleged impairment and subjective complaints that he properly discredited. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (ALJ may exclude alleged impairments he has properly rejected as untrue or unsubstantiated). Based on a proper hypothetical, the vocational expert testified that Claimant was able to perform jobs such as routine type assembly work including a small parts assembler and hospital products assembling with such jobs existing in significant numbers in the local and national economies. The vocational expert's testimony provided substantial evidence to support the ALJ's determination that Claimant could perform light work with the exceptions set forth. Therefore, substantial evidence supports the ALJ's determination that Claimant was not disabled. Id.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the final decision of

the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.


<u>          /s/ Terry I. Adelman          </u>
UNITED STATES MAGISTRATE JUDGE

Dated this <u>15th</u> day of August, 2014.